O'BRIEN, Plaintiff-Appellant, v BRADULOV, et, Defendants-Appellees.

Ohio Appeals, Eighth District, Cuyahoga County.

No. 20872. Decided May 10, 1948.

M. S. Cerrezin, Thos. Terrett, Cleveland, for plaintiff-appellant.

Forrest E. Wilson, M. Phillips, Cleveland, for defendants-appellees.

## OPINION

By MORGAN, J.

This is an action by the plaintiff-appellant, O'Brien, against Michael Bradulov, his wife and daughter, for the specific performance of a land contract. The common pleas court decided the case for the defendants and the plaintiff appealed on law and fact.

The record discloses that on September 22, 1944, plaintiff and defendants entered into a written contract by which the plaintiff agreed to purchase the defendants' homestead property at 18405 South Moreland Boulevard, Shaker Heights, Ohio, for the sum of $20,300.00. The purchaser on the same date paid $1000.00 to Michael Bradulov to apply on the purchase price. The agreement further provided:

"Balance to be paid $19,300.00 on or before forty-five days from date in escrow with The Cuyahoga Abstract Title & Trust Company."

The escrow instructions were signed by both parties and provided that "Grantee will deposit in escrow $19,300.00 on or before November 6, 1944." Michael Bradulov deposited the deed to the premises in escrow with the Abstract Company on November 6, 1944. The plaintiff did not deposit the remainder of the purchase price on November 6, 1944. On January 4, 1945, Bradulov appeared at the office of the Abstract Company and announced that he was cancelling the sale and purchase contract because of the failure of the plaintiff to comply with the terms of the contract. He deposited $1000.00 with the Abstract Company to be delivered to O'Brien and on the next day withdrew the contract of Sept. 22, 1944 and was deed. The Abstract Company, by letter, immediately notified O'Brien of what Bradulov had done. No previous notice of an intention to cancel the contract and escrow agreement was given by Bradulov to O'Brien.

There is considerable conflict in the evidence as to what occurred between the parties after the sales contract of Sept. 22, 1944 was signed. O'Brien testified that at the meeting on September 22, 1944 there was discussion as to when the deal could be closed. Robert Sill was representing Bradulov in the sale to O'Brien and O'Brien had also placed the sale

of his house and lot located at 13809 Cormere Road, Cleveland, Ohio, in Mr. Sill's hands. O'Brien testified that at the meeting with Bradulov before the contract was signed Sill said to O'Brien:

"Well, I have got your property for sale. I can sell your property very quickly because it is a good location."

O'Brien then said: "Well, suppose it isn't sold—then just what?" O'Brien testified that Bradulov then spoke up and said: "Well, there is no hurry about it because I am not ready to move."

O'Brien testified that the next time he saw Bradulov was around November 1st at Huml's office. O'Brien said to Bradulov: "The date will be November 6 and I haven't sold my house yet." Bradulov replied, according to O'Brien, "Why, take your time, I am not greedy for the money, take all the time you want." O'Brien also said, "Well, I want to know where I stand here for after all this is a business matter. Just how do I know that this extension of time beyond November 6 will be all right?" Bradulov replied, "Well I have got $1000.00 of your money and I am not worrying about you as long as I can stay there for a few months and you are agreeable and I don't have to pay rent."

O'Brien further testified that the next time he saw Bradulov was on or about December 6 or 7. The meeting was at about 5 o'clock in his office. At this meeting O'Brien testified that he told Bradulov that his house was not selling as fast as it was expected but he felt sure the sale would be made very soon because he had two or three good propositions that were "hot offers." O'Brien asked Bradulov what his situation was and Bradulov replied that "he had not definitely found a place yet." Bradulov mentioned having a property in Mentor but that he did not want to move out there in the winter. O'Brien told Bradulov that he could get a mortgage if necessary and Bradulov again said, "take all the time you want, I'm not greedy for that money. I don't need the money. Wait 'til you sell your house."

O'Brien further testified that he sold his home on December 29, 1944 to Judge Ralph Vince through Robert Sill, his agent, who also had been Bradulov's agent in selling the latter's house to O'Brien. In the meantime through Mr. Sill, O'Brien was assured of a loan of $6300.00 from The Pacific Mutual Life Insurance Company which, with the amount he would receive for his Cormere property from Vince, would pay the balance which he owed to Bradulov.

O'Brien testified that he did not hear any more from

Bradulov but on or about January 5, 1945, he received a letter from the Abstract Company stating that Bradulov had been in their office on January 4, and had cancelled the contract and the escrow and his deed had been returned to him. On receiving the letter from the Abstract Company O'Brien testified that he called Bradulov by telephone and stated that "he was amazed to find that he, without having said a word to me, had gone over to the title company and had deposited this money and requested his deed and received it, * * * and I asked him what was wrong. He said 'well, what about the furniture?'" O'Brien then said "maybe we could get together on the furniture. Mrs. O'Brien liked some of it and that if we could agree on a price I would be glad to buy the furniture." Bradulov then said "he wasn't going to close the deal unless I bought his furniture." Mr. and Mrs. O'Brien afterwards visited the Bradulov home and although they did not meet Bradulov, Mrs. Bradulov and her daughter showed the O'Briens through the house and O'Brien testified that "we marked the things that we were interested in, the articles of furniture, and then following that visit there I talked with Bradulov and asked him his price and he said $5700.00 * * * I called him up again and asked him if the furniture bills were avaliable—the invoices—and they were not, so I suggested that an appraiser or two be had. I mentioned for him to get one and I would get one." O'Brien had an appraiser who checked over the furniture in the Bradulov home and he told O'Brien that "he thought $2500.00 was a very fair price. Then I offered Mr. Bradulov that amount." Bradulov adhered to his price of $5700.00. In a later meeting with Bradulov in Mr. Huml's office at which Mr. Sill was present, O'Brien testified that he increased his offer to $2700.00 for the furniture.

O'Brien further testified that he was ready and willing to buy the Bradulov house and lot upon the terms of the contract of Sept. 22, 1944.

The evidence given by Bradulov conflicts in important particulars with the evidence of O'Brien. Bradulov testified that he did not know that O'Brien was selling his own home. He added, "I never knew that Mr. O'Brien had a home." He testified:

"Q. At no time knowledge was offered to you or information given that Mr. O'Brien was selling his home?
A. No sir.
Q. Not even by Mr. Sill?
A. No sir."

Also:

"Q. And do you recall that right there and then, in your presence, O'Brien listed his house with Mr. Sill the same broker that you had?

A. Do you mean his house?

Q. Yes, for sale.

A. I never knew he had a home.

Q. And do you recall Mr. Sill saying that the demand for houses was so great that he will sell it within a very short time—a matter of a couple of weeks or so?

A. No. I never discussed it."

Bradulov also testified:

"Q. And do you recall telling him (O'Brien) 'take your time take all the time you want; I am not greedy for the money.'

A. No sir.

Q. Do you recall your telling him 'don't worry about it. I have your $1000.00. I have complete protection.'?

A. No sir.

Q. Do you deny making such a statement in substance?

A. What do you mean by 'do I deny it?'

Q. That you told O'Brien not to hurry—take all the time he wanted—You had the $1000.00 of his as a protection?

A. I never made such a statement."

Bradulov also testified as follows:

"Q. Following your withdrawal of the deed did you at any time discuss the purchase of the furniture by O'Brien?

A. No sir.

Q. Never discussed the price?

A. No, sir.

&ast;          &ast;          &ast;          &ast;          &ast;

Q. Did you ever ask $5700.00 for the furniture they selected?

A. No sir.

&ast;          &ast;          &ast;          &ast;          &ast;

Q. Did you ever discuss with O'Brien the price of the furniture?

A. No sir."

It is fortunate that in these matters of a square conflict of testimony the record contains the evidence of Mr. Sill who was both Bradulov's and O'Brien's agent. Sill was wholly a disinterested witness. Sill testified that he had a talk with Bradulov around election time in November, 1944. At that time Sill said he told Bradulov "that Mr. O'Brien told me he wanted

—he preferred to close his deal when the Cormere (O'Brien) property was sold. * * * Bradulov did not say he would wait until the house was sold but he did indicate that he would talk to O'Brien."

As to furniture Sill testified that after January 4, 1945, Bradulov said to Sill "well if Mr. O'Brien would have bought his furniture, some furniture that was involved, he would go through with the deal then." Sill testified this conversation was around January 10, 1945. Sill also testified as to the meeting in Huml's office which he said took place "around the 15th of January. It might possibly be the 20th." O'Brien and Bradulov were also present. Sill was asked, "Will you kindly tell the court what took place there?" and he answered, "Well, there was a question of what was the fair price of some furnishings owned by Mr. Bradulov and Mr. Bradulov contended that the price should be—he had the sales bills of the people that furnished this furniture—he thought the furniture was used very little and he should get a price near to what he paid for it and Mr. O'Brien had a different opinion. Whether this difference was $1000.00 or $700.00 I cannot remember, but it was enough so that both gentlemen could not agree." However, the understanding was, Sill testified, "if O'Brien bought the furnishings, he (Bradulov) would have gone right ahead with the transaction."

When Sill was asked whether he had informed Bradulov about this Cormere deal, and that some of the money was coming from that source Sill answered, "Yes, I told him that." In addition to the $14,300.00 obtained from the sale of the Cormere property, Sill testified that he made a loan of $6300.00 with The Pacific Mutual Life Insurance Company for O'Brien which amount was available as shown by the letter of the company dated January 30, 1945, which is an exhibit in the record.

Bradulov testified to a conversation with Mr. and Mrs. O'Brien at his home on Dec. 21, 1944. He testified that "Mr. O'Brien said, if I could hold about a $10,000.00 mortgage against the property—I said to Mr. O'Brien, 'Mr. O'Brien you monkey around with mortgage, no, never, the deal is off.'" This conversation was denied by O'Brien and also by Mrs. O'Brien.

O'Brien testified that he never asked Bradulov to take a mortgage for a part of the consideration and he was never told by Bradulov that the deal was off. O'Brien sold his Cormere property on Dec. 29, 1944 and on that day Mrs. O'Brien testified she called up Bradulov by telephone and told him that "we sold our house." She further testified "I called up the day we sold the house, I mean when the house was sold to Mr. Vince, I called Mr. Bradulov by phone that

day and told him that we sold our house and Mr. Vance had to get in right away and that we had to get out right away and I asked him if he would let me know when we could take the place and he said he would get in touch with Mr. O'Brien that day." Bradulov said nothing at that time about the alleged previous conversation in which he said that "the deal is off." Bradulov, when on the stand, did not deny this conversation with Mrs. O'Brien.

Mrs. O'Brien also testified that Mrs. Bradulov both before and after the Christmas' holidays, said "she was not in any hurry to move, that we need not hurry because her little girl went to school and where they were going to move she didn't want her to go in the winter weather."

In the contract in this case there was no provision that time should be of the essence of the contract. An excellent statement of the rule for determining materiality of delay in performance of such a contract is found in the Restatement of the Law of Contracts, Sec. 276, page 406 as follows:

"In determining the materiality of delay in performance the following rules are applicable:

(a) Unless the nature of a contract is such as to make performance on the exact day agreed upon, of vital importance, or the contract in terms provides that it shall be so, failure by a promisor to perform his promise on the day stated in the promise does not discharge the duty of the other party.

(b) In mercantile contracts performance, at the time agreed upon is important, and if the delay of one party is considerable, having reference to the nature of the transaction and the seriousness of the consequences and is not justified by the conduct of the other party, the duty of the latter is discharged.

(c) If delay of one party in rendering a promised performance occurs before any part of his promise has been rendered, less delay discharges the duty of the other party than where there has been part performance of that promise.

(d) In contracts for the sale or purchase of land delay of one party must be greater in order to discharge the duty of the other party than in mercantile contracts.

(e) * * *."

The law in Ohio is in accord with the above statement. As was said by Judge Thurman, in **Kirby v Harrison et al, 2 Oh St 327 at page 331:**

"It has often times been held that time is not of the

essence of a contract for the sale of real estate unless made so by the contract of the parties."

Although a vendor in a contract for the sale of land, where time is not of the essence, has no right to rescind or cancel the contract because of delay in performance by the vendee, he is not without remedy. As said by Judge Thurman in **Kirby v Harrison et al, 2 Oh St 327 at page 332:**

"3. Although there is no stipulation of the parties that time shall be of the essence of the contract, nor anything in the nature or circumstances of the agreement to make it so, yet it may be made essential by the proper action of a party who is not in default and is ready to perform, if the other party is in default without justification. Thus, if the vendee. without sufficient excuse, fail to pay at the stipulated time, and the vendor is in no default, and is able and ready to perform all that the contract then requires of him, he may notify the vendee to pay within a reasonable time or he (the vendor) will consider and treat the contract as rescinded. In such case if payment be not made within a reasonable time, the vendor has a right to treat the contract as abandoned by the vendee. In like manner, and with like consequences, the vendee may notify the vendor, if the latter is in default and the former is not. **Remington v Kelley, 7 Ohio (Pt. 2) 97; Higby v Whitaker 8 Ohio 201.**"

This case was followed in the case of **Condorodis v Kling, 33 Oh Ap 452, paragraph 5** of the syllabus as follows:

"5. When time is not of essence of contract which is still wholly executory, party who is not in default and is ready, able and willing to perform, may make performance by other party within reasonable time a condition of his own further liability by serving notice to perform within such time."

Bradulov did not follow the course suggested in **2 Oh St 327** and in **33 Oh Ap 452,** but without any notice to the vendee of his intention so to do, attempted to cancel the contract and withdraw the escrow. Clearly, he had no right to take such action.

A reading of the record in this case makes clear that Bradulov knew about the fact that O'Brien had placed his home in Sill's hands to sell and that O'Brien expected to use the money obtained for his Cormere property, in payment for Bradulov's property. The statement by Bradulov that he did not know that O'Brien had a home, was a fabrication.

Likewise, after January 4, 1945, the date of the attempted cancellation of the contract by Braduolv, there is no doubt but that all parties conferred about the sale of Bradulov's furniture to O'Brien. Sill's evidence removes any doubt upon this point.

Likewise, it is our opinion that O'Brien was lulled into a feeling of security by Bradulov's statement that he should not hurry and that so long as Bradulov was not asked to pay rent, he was satisfied to wait. On January 4, 1945, when Bradulov attempted to cancel the contract, he already knew that O'Brien had completed the sale of his home on December 29, 1944 and would be in a position very soon to complete his contract.

It is evident that something caused Bradulov to regret having sold his property but his attempt to rescind and cancel the sale had no legal justification.

The judgment in this case is reversed and a decree is rendered against the defendants and in favor of the plaintiff for specific performance of the contract. Exc. Order See Journal.

HURD, PJ, SKEEL, J, concur.